65437. CASTILLO v. THE STATE.
65438. ARENAS v. THE STATE.
65501. CANASI v. THE STATE.
65502. CASTRO v. THE STATE.
65503. EDUARTE v. THE STATE.
65536. OLANIEL v. THE STATE.

POPE, Judge.

Defendants were indicted, tried and convicted of possession of a controlled substance with intent to distribute in violation of OCGA § 16-13-30(b)(formerly Code Ann. § 79 A-811(b)). All except defendant Eduarte were sentenced to ten years and fined $10,000. See OCGA § 16-13-30(h) (formerly Code Ann. § 79A-811(h)). Eduarte, the only female defendant, was sentenced to five years and fined $5,000. Defendants Castillo and Arenas filed a joint appeal and the others have appealed individually. Because defendants were tried together and they now raise many of the same issues, we have joined the appeals.

1. The theory of the state's case at trial was that all six defendants were parties to the smuggling of the drugs and thus were guilty of joint constructive possession of the drugs. See OCGA §§ 16-13-30(b), possession; 16-2-20 and 16-2-21 (formerly Code Ann. §§ 26-801 and 26-802), parties to crime; and *State v. Lewis,* 249 Ga. 565 (292 SE2d 667) (1982). The evidence presented in support of this theory was circumstantial and allegedly insufficient. See OCGA § 24-4-6 (formerly Code Ann. § 38-109). We find it appropriate to present a detailed account of the evidence adduced at trial in order to render our conclusions regarding the general grounds meaningful.

An agent of the Georgia Bureau of Investigation (GBI) received a tip that a large quantity of drugs would soon be delivered to a

certain apartment in Gainesville, Georgia. Henry Grady Lord, Ivan Martinez and defendant Canasi, all suspected of being large-scale drug dealers, were directly implicated by the informant. The informant was considered reliable because he or she had previously given the GBI reliable information on drug deals five times in the past two years and because he or she made a declaration against his or her penal interest (admission of having purchased illegal quaaludes) along with this tip. Moreover, the GBI agent was able to verify at least some of the information provided by listening to a telephone conversation between the informant and one of the named suspects. (The informant, however, was not a participant in the transaction.) Based upon the aggregate of this information, the GBI began continuous surveillance of the apartment.

The GBI found that the apartment was rented to Martinez and that Canasi was staying there. On the second day of surveillance Canasi was observed going to a nearby liquor store where he made several telephone calls and then returned to the apartment. Shortly afterward, a pickup truck pulled up to the apartment with a Hispanic male (possibly Martinez) and a white female (identified as Lord's wife) inside. The two went into the apartment and stayed for approximately two hours. When they exited the apartment, they were accompanied by Henry Lord and the three left in the truck with Henry Lord driving.

On the evening of the third day of surveillance, Canasi was observed going again to the liquor store. He made at least one telephone call and then waited there for approximately an hour, watching closely every automobile approaching the store. A Chevrolet station wagon arrived at the store with a Ford Granada directly behind it. Both automobiles had Florida license tags with Dade County (Miami) stickers. Only one person (later identified as defendant Arenas) was in the Chevrolet and three or four people were in the Ford, with a woman (later identified as defendant Eduarte) in the back seat. Canasi got into the Chevrolet and both automobiles went directly to the apartment together.

The occupants of both automobiles spent the night in the apartment. During the night, either Canasi or defendant Olaniel moved the Ford from the front to the back of the apartment. The next morning (the fourth day of surveillance), Olaniel started the engine of the Ford, cleaned the windshield and checked under the hood. Defendants Arenas and Castillo took the Chevrolet to a nearby Holiday Inn, where they had registered for a room. Arenas put some luggage in the room and then the two ate lunch in the motel restaurant. They then went to a service station to have some minor repairs done on the automobile.

In the meantime, the GBI had procured a search warrant for the apartment and the two automobiles. After Arenas and Castillo were arrested while driving back toward the apartment, other GBI agents and local law enforcement officers went to the apartment, knocked and, when Canasi cracked the door, burst in. Canasi was immediately seized and he advised the arresting officer that he had a gun in his back pocket. Olaniel was also seized immediately. Defendant Castro ran to the back bedroom where Eduarte was and both were seized there. All those arrested were from Miami and all were either Cuban or emigrants from Cuba.

After securing the suspects, the agents executed the search warrant. They searched the apartment, in which the only furniture was a television set and a coffee table, but found no drugs. No drugs were found in the Chevrolet either. The keys to the Ford were found in Canasi's pocket and the search of that automobile proved to be more fruitful. Under the back seat of the Ford one hundred bags containing a total of one hundred thousand (100,000) pills were discovered. The drugs were concealed from view but detectable by feel through the fabric of the seat. Each pill bore the inscription "Lemmon 714," the manufacturer's identification of methaqualone (quaaludes). After chemical analysis, however, the pills were discovered to be diazepam (valium), but triple the dosage of the strongest prescription level. The pills thus were "counterfeit quaaludes" or "bootleg quaaludes," with a street value of between $300,000 and $600,000. Diazepam is a Schedule IV controlled substance. OCGA § 16-13-28(a)(10) (formerly Code Ann. § 79A-809(b)(10)).

At the close of the state's case, all six defendants moved for directed verdicts of acquittal. The trial court denied the motions and defendants assert that the court thus erred. We disagree. If there is any evidence of guilt, it is for the jury to decide whether that evidence, circumstantial though it may be, is sufficient to warrant a conviction. *Jarrard v. State,* 163 Ga. App. 99 (1) (292 SE2d 488) (1982); *Walls v. State,* 161 Ga. App. 625 (1) (288 SE2d 769) (1982); see OCGA § 17-9-1(a) (formerly Code Ann. § 27-1802(a)). We hold that the state presented more than ample evidence to survive the motions for directed verdict. See *Henderson v. State,* 162 Ga. App. 320 (9) (292 SE2d 77) (1982); *Slack v. State,* 159 Ga. App. 185 (3) (283 SE2d 64) (1981); see also Division 2, infra.

During the presentation of the individual defenses, each of the defendants testified. Canasi testified that he was in Gainesville to set up a deal to buy 390 television sets from one Jack Allen in conjunction with another man from Florida named Cohen (who also testified and corroborated this). Canasi said he had become acquainted with Allen

through Lord, whom he had met through Martinez. He contended that it was Allen, rather than Martinez, who had come with Ms. Lord to the apartment, and he also claimed that Henry Lord was not there at that time. Canasi further stated that he had gotten the gun from Lord, but not that day.

Canasi testified that the furniture in the apartment belonged to Martinez and that Castro had moved the other furniture back to Miami for Martinez a week earlier. Martinez owned a body shop in Miami and he also bought and sold automobiles. Canasi also owned a body shop in Miami, as well as an automobile repair and machine shop. Canasi's version of the arrival of the two automobiles was also substantially different than that of the state's witnesses. Canasi asserted that Castro, Arenas and Castillo were in the Chevrolet (rather than just Arenas) and that only Olaniel and Eduarte were in the Ford. He also claimed that he did not previously know Arenas or Castillo.

Castro testified that he was in the moving business and that he came to Gainesville to move the remaining furniture for Martinez. He contended that he was riding in the Chevrolet with Arenas and Castillo and that the two were just going to drop him off at the apartment. He was to accomplish the moving by renting a truck there. Castro also claimed that he was driving the Chevrolet when it arrived in Gainesville. Castro asserted that he did not know any of the other defendants except Arenas, whom he only knew casually in Miami. He said he first saw the Ford at the liquor store. He claimed the only reason he, Arenas and Castillo stayed at the apartment was because the heater in the automobile had broken and the windows had iced over in the bad weather.

Arenas corroborated Castro's testimony. Arenas also testified that he had registered to stay in the Holiday Inn the night they stayed in the apartment. This was corroborated by the motel manager and motel records. Arenas said he put his luggage in the room when he and Castillo went to the motel the day of the arrest. Luggage was in fact found there. He also testified that he previously knew only Castillo and Castro.

Castillo testified that he was going with Arenas on a trip to Chicago and that they stopped in Gainesville only to drop off Castro. He also claimed that they only stayed in the apartment because of the weather and problems with the automobile. He asserted he had known only Arenas previously.

Olaniel testified that his reason for coming to Gainesville from Miami was to pick up Canasi as a favor. He claimed that he had owned the Ford, but had sold it, and then was only using it with the new owner's permission. Olaniel said he brought his girlfriend, Eduarte,

along and that they were the only two in the Ford. He contended that she had stayed in the front seat and had been driving when they arrived in Gainesville. Olaniel denied knowing any of the defendants other than Canasi and Eduarte.

Eduarte corroborated Olaniel's testimony. She further testified that she first saw the Chevrolet when it was already stopped at the liquor store. She claimed she previously had known none of the others except Olaniel. She also contended that he was in the back bedroom with her when the agents came into the apartment.

All six of the defendants denied any knowledge of the drugs in the Ford. Viewing all the evidence presented, it can be readily seen that the jury had the difficult task of evaluating materially conflicting testimony. We cannot say which evidence the jury believed and which evidence the jury rejected, nor will we now substitute our judgment because we did not have the opportunity to hear the witnesses and observe their demeanor. See *Jones v. State,* 159 Ga. App. 472 (283 SE2d 691) (1981); *Searcy v. State,* 158 Ga. App. 328 (1) (280 SE2d 161) (1981). The verdict evinces that the jury chose to disbelieve the material parts of defendants' testimony, but this is the risk defendants assumed when they chose to testify. See *Robinson v. State,* 164 Ga. App. 652 (2) (297 SE2d 751) (1982); see also *Dansby v. State,* 165 Ga. App. 41 (1) (299 SE2d 579) (1983); *Jones v. State,* 165 Ga. App. 36 (1) (299 SE2d 576) (1983).

We must view the evidence in a light most favorable to the verdict and, in doing so, we conclude that the evidence was sufficient to exclude every *reasonable* hypothesis save defendants' guilt and that any rational trier of fact could have found each defendant guilty beyond a reasonable doubt. *Christopher v. State,* 162 Ga. App. 626 (1) (292 SE2d 478) (1982); see *Prescott v. State,* 164 Ga. App. 671 (1,2) (297 SE2d 362) (1982); *Smith v. State,* 164 Ga. App. 624 (1) (298 SE2d 587) (1982); see also Division 2, infra.

2. In support of their contention that the evidence was insufficient to support the convictions, defendants rely (as they did at trial) upon the "equal access" rule. They basically contend (individually) that actual possession was not shown (which is true) and that constructive possession cannot be attributed to any of them because the others had equal access to the drugs.

The "equal access" rule is not nearly as broad as defendants sought to apply it at trial or as they now would have us apply it. The rule, as it applies in the automobile context, is merely that evidence showing that a person or persons other than the owner or driver of the automobile had equal access to contraband found in the automobile may or will, depending upon the strength of the evidence, overcome the presumption that the contraband was in the exclusive possession

of the owner or driver. *Moore v. State,* 155 Ga. App. 149 (1) (270 SE2d 339) (1980); *Farmer v. State,* 152 Ga. App. 792, 794-97 (264 SE2d 235) (1979). The rule, conceptually and historically, has no application where, as here, all persons allegedly having equal access to the contraband are alleged to have been in joint constructive possession of that contraband. See generally *Chambers v. State,* 162 Ga. App. 722 (1) (293 SE2d 20) (1982); *Battle v. State,* 160 Ga. App. 111 (1) (286 SE2d 341) (1981); *Patterson v. State,* 159 Ga. App. 290, 293 (283 SE2d 294) (1981); *Speight v. State,* 159 Ga. App. 5 (1) (282 SE2d 651) (1981), cert. den., 455 U. S. 947 (1982); *Moore v. State,* supra; *Farmer v. State,* supra, and cases cited therein. It is simply a defense available to the accused to whom a presumption of possession flows.

Because the state did not show the indicia giving rise to the presumption, that is, ownership or exclusive control of the vehicle, no presumption arose and therefore there was no triggering of the equal access defense. On the other hand, the equal access theory formulating the basis of the rule worked to the unusual advantage of the state in this case. By showing circumstantially that each of the defendants had equal access to the drugs, the state was able to support its theory that all of the defendants were parties to the crime and thus guilty of joint constructive possession of the drugs. See *State v. Lewis,* supra; OCGA §§ 16-2-20 and 16-2-21 (Code Ann. §§ 26-801, 26-802); compare OCGA § 16-4-8 (formerly Code Ann. § 26-3201).

We pause to note that the defense strategy revolving around the equal access rule, though based upon a misconception of the scope of the rule, was not entirely futile. On the contrary, defendants' tenacious showing that the state could not prove either actual possession or sole constructive possession on the part of any defendant impressed the trial court such that it included the principle that mere presence at the scene of a crime cannot support a conviction (see *Parker v. State,* 155 Ga. App. 617 (2) (271 SE2d 871) (1980)) four times in its charge to the jury.

3. Defendants Castillo, Arenas and Canasi contend that the trial court erred in denying their motions for disclosure of the identity of the informant. "It was not error for the trial court to fail to require disclosure of the identity of the informant. The evidence in this case shows the informer was a mere tipster. Disclosure is not required." *Pressel v. State,* 163 Ga. App. 188 (3) (292 SE2d 553) (1982); see also *Dyer v. State,* 162 Ga. App. 773 (2) (293 SE2d 42) (1982); *Henderson v. State,* supra at (2).

4. Defendants Castillo and Arenas contended that the trial court erred in refusing to conduct an in camera inspection of a tape recording of the informant's conversation with one of the named

suspects. In *Tribble v. State,* 248 Ga. 274 (280 SE2d 352) (1981), the Supreme Court held that a trial court is required to make an in camera inspection of specific items of evidence or information assertedly discoverable under Brady v. Maryland, 373 U. S. 83 (83 SC 1194,10 LE2d 215) (1963), if such specific inspection is requested by the defense. *Tribble v. State,* supra at (2). (This rule does not extend to general Brady motions. Id. at (1); *Reed v. State,* 249 Ga. 52 (3) (287 SE2d 205) (1982); *Cooper v. State,* 163 Ga. App. 482 (3) (295 SE2d 161) (1982)). The Court in *Tribble v. State,* supra at (3), further held that the trial court can cure its error in refusing to conduct the inspection before trial by conducting an inspection after trial (assuming the subsequent inspection reveals that the information was not wrongfully withheld).

Under *Tribble v. State,* therefore, the trial court was required to comply with the specific request for an in camera inspection of this recording and, because the court failed to do so prior to trial, we remanded the case in accordance with *Hill v. State,* 250 Ga. 164 (2) (295 SE2d 838) (1982), with direction that the inspection be conducted. It thereafter came to the state's attention, however, that the recording referred to at the pretrial hearing did not, and never did, exist. The trial court then ordered a hearing on the matter with all defense counsel present. At the hearing, the GBI agent who had overheard the conversation testified that it was not recorded, that the only defendant mentioned in it was Canasi and that the conversation revealed no exculpatory information. The testimony was subjected to full cross-examination. The trial court then concluded that there was no Brady violation and we concur.

5. Defendants Castro, Olaniel and Eduarte claim that the trial court erred in charging on parties to a crime. Olaniel and Eduarte further claim that the court erred in charging on constructive possession. The claims are wholly without merit. The charges were not only authorized, but required by the issues and evidence. See Division 1, supra; see generally *Shumake v. State,* 159 Ga. App. 141 (2) (282 SE2d 756) (1981).

6. Defendant Olaniel contends that the search warrant was impermissibly overbroad and general. He takes particular issue with the language authorizing the agents to search "any other person found on said premises who reasonably might be involved in the commission of the aforesaid violation of the laws" as well as "any motor vehicle found on said premises." Both clauses appear in the preprinted portion of the search warrant form.

As to the "other persons" clause, "a warrant which identifies the premises and its owners or occupants is not void as a general warrant because it authorizes the search of other persons found there who

may reasonably be involved in the commission of the crime for which the warrant is issued." *Willis v. State,* 122 Ga. App. 455, 457 (177 SE2d 487) (1970). As to the "any vehicles" clause, we find that the scope of the search is sufficiently limited by the specific language typed in the blank spaces of the form, to wit: "To include the vehicles described as: Vehicle # 1. being a Brown Chevrolet Station Wagon, 4 Dr., Bearing Florida License plate # UWJ-006. Vehicle # 2 Being a Red with light colored Roof, Ford Granada, bearing Florida License Plate # LZR-327. Both of these vehicles are at the Apartment location described above." See generally *Butler v. State,* 130 Ga. App. 469 (1) (203 SE2d 558) (1973).

Closely related to his facial attack on the warrant, Olaniel asserts that the warrant is invalid because it was not supported by probable cause. The facts supporting the request for issuance of the warrant (summarized in Division 1, supra) amply show that probable cause existed. The GBI not only had a tip from an informant shown to be reliable, but also was able to verify the tip by listening to the informant's conversation with one of the named suspects. (see Division 4, supra) and by conducting surveillance on the apartment for three days prior to requesting the warrant. See generally *Hardy v. State,* 162 Ga. App. 797 (2) (292 SE2d 902) (1982); *Keller v. State,* 162 Ga. App. 100 (290 SE2d 204) (1982); *Dugan v. State,* 130 Ga. App. 527 (1) (203 SE2d 722) (1974).

7. In considering the general grounds we have found a substantial error in the sentences of each defendant. Defendants violated OCGA § 16-13-30(b) (Code Ann. § 79A-811) by possessing, with intent to distribute, a controlled substance, that is, diazepam, a Schedule IV controlled substance (OCGA § 16-13-28(a)(10) (Code Ann. § 79A-809)). OCGA § 16-13-30(h) (Code Ann. § 79A-811) provides: "Any person who violates subsection (b) of this Code section with respect to a controlled substance in Schedule III, IV, or V shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than one year nor more than ten years." The statute does not authorize imposition of any fines and therefore the trial court was without authority to impose the $5,000 fine on defendant Eduarte and the $10,000 fines on each of the other defendants. A trial judge may only "fix a sentence within the limits prescribed by law." OCGA § 17-10-2(a) (formerly Code Ann. § 27-2503(a)); see *Richards v. State,* 160 Ga. App. 489, 490 (287 SE2d 394) (1981). Compare OCGA § 17-10-8 (formerly Code Ann. § 27-2529), allowing the imposition of a fine as a condition of probation. The fines imposed are void and must be, and are hereby, stricken from the respective sentences.

*Judgment affirmed with direction. Quillian, P. J., and Sognier,*

*J., concur.*

Decided May 19, 1983 —
Rehearings denied June 7, 1983 — ▆▆▆▆▆▆▆▆▆

*Daniel Lee Dean,* for appellants (case nos. 65437, 65438).

*Teddy R. Price, John Crudup,* for appellant (case no. 65501).

*Edward D. Tolley, Thomas H. Rogers, Jr.,* for appellants (case nos. 65502, 65503, 65536).

*Bruce L. Udolf, District Attorney, Donna F. Irvin, Charles H. Frier, Assistant District Attorneys,* for appellee.